*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

KATHLEEN NAEYAERT,

　　　　　Plaintiff-Appellee,

v

AUTO CLUB GROUP INSURANCE COMPANY,

　　　　　Defendant-Appellant.

UNPUBLISHED
August 11, 2025
11:44 AM

Nos. 369589, 371721
Macomb Circuit Court
LC No. 2021-002769-NF

Before: YOUNG, P.J., and LETICA and KOROBKIN, JJ.

PER CURIAM.

In this contract dispute, defendant, Auto Club Group Insurance Company, appeals by right two orders entering judgment for and awarding damages to plaintiff, Kathleen Naeyaert, following a bench trial. Because we hold that the contract in question does not obligate defendant to buy a new van that is modified to accommodate plaintiff's wheelchair, we reverse and remand for entry of judgment in defendant's favor.

## I. BACKGROUND AND FACTS

Plaintiff was seriously injured in an auto accident in 1973, suffering a spinal cord injury, closed head injury, broken legs, and cardiac arrest, which required her to use a wheelchair. She learned to drive a modified van at age sixteen. Since the accident, plaintiff has driven such modified vans, which are lower than a typical van, have a special kneeling system to lower the van more, have a chassis with air ride shocks, and have a ramp to allow access using her wheelchair. Defendant had previously bought two such vans for plaintiff in 2004 and 2012, but when plaintiff filed another claim around 2018, defendant refused to buy a third new van, citing *Admire v Auto-*

*Owners Ins Co*, 494 Mich 10; 831 NW 2d 849 (2013).[1] The van that defendant had purchased for plaintiff in 2012 was stolen in 2021.

In 2021, plaintiff filed suit against defendant, claiming that defendant failed to pay certain personal injury protection insurance benefits in violation of the no-fault act, MCL 500.3101 *et seq.*, and that defendant breached contracts by failing to purchase a modified van for plaintiff. Consequently, plaintiff sought benefits and damages.

The case proceeded to a bench trial. Dr. Edward Dabrowski, plaintiff's treating doctor, testified via deposition that a modified van was reasonably necessary based on plaintiff's medical condition. Plaintiff testified that she entered into two contracts with defendant in 2004 and 2012 to receive a new vehicle every seven years or one hundred thousand miles, whichever came first. Defendant purchased two vans for plaintiff under these agreements. The trial court took under advisement defendant's objections to the 2004 and 2012 contracts being admitted into evidence, and later sustained the objection to the 2004 contract, but admitted the 2012 contract.

The 2012 contract provides, in pertinent part, as follows:

(1) It is agreed between the insured and the insurer that the insurer shall pay $64,806.82 for the purchase of a handicapped-equipped 2012 ODYSSEY EX-L van, VIN # 5FNRL5H6XCB035803, said price includes the cost and installation of the special handicap equipment necessary for van modifications.

* * *

(3) It is further agreed between the insured and the insurer that no claims for another van/motor vehicle may be made for seven (7) years from the date of delivery of the van/motor vehicle to the insured . . . .

Plaintiff testified that she filed a claim with defendant for a new van sometime in or before 2018. Thereafter, in December 2018, plaintiff said that she received a call from defendant's claims adjuster, Kelly Prusinski, advising her that defendant was "no longer going to follow the agreement" because of the *Admire* case. Prusinski told plaintiff that she would have to purchase the van herself, advising plaintiff via letter that "we are waiting for you to purchase the vehicle so that we can move forward appropriately as well as timely" with paying for the modifications. When plaintiff's van, which defendant purchased for her in 2012, was stolen in 2021, plaintiff had possessed it for over seven years. At the time of trial, plaintiff had not bought a new van.

---

[1] In *Admire*, our Supreme Court held that the base price of a new modified van was not an allowable expense under the no-fault act, MCL 500.3107(1)(a), because it is an ordinary transportation expense that is easily separated from modifications. *Admire*, 494 Mich at 14. Instead, the Court held, insurers are responsible only for the costs of modifications to a van that the insured must procure on their own. *Id.*

Regarding damages, plaintiff's attorney attempted to admit a proposal from Mobility Works regarding the cost of a new van and modifications in 2021, but the trial court sustained defense counsel's objection. When the trial court asked plaintiff if she knew how much the modification to the van would cost, she stated that did not know.

After plaintiff rested, defendant moved for a directed verdict[2] on the basis that the contracts did not obligate defendant to buy plaintiff a new van.[3] The trial court took the motion under advisement and later issued an opinion and order with its findings of fact and conclusions of law. Relevant here, it held that the 2012 agreement between the parties required that defendant purchase another new van for plaintiff.[4] The trial court found that the agreement contained a latent ambiguity as to what the parties agreed to should plaintiff bring a claim for another van. Consequently, the trial court looked to extrinsic evidence, concluding that defendant was obligated to purchase a new van for plaintiff. It therefore denied defendant's motion for directed verdict and ordered the parties to "submit briefs and admissible evidence establishing the amount of damages for the cost of the new proposed van and required modifications, only." In a subsequent opinion and order, following submissions by the parties addressing damages, the trial court awarded plaintiff $41,433.00 for the purchase of a new van. Ultimately, the court awarded judgment to plaintiff in the amount of $47,534.74, which included prejudgment interest and some costs.

Defendant now appeals.

## II. STANDARD OF REVIEW

"We review the trial court's findings of fact in a bench trial for clear error and conduct a review de novo of the court's conclusions of law." *Chapdelaine v Sochocki*, 247 Mich App 167, 169; 635 NW2d 339 (2001). "[T]he proper interpretation of a contract is [] a question of law that we review de novo." *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 467; 663 Mich 459 (2003). "Whether a contract is ambiguous is a question of law. Only when contractual language

---

[2] Procedurally, defendant should have moved for involuntary dismissal. See *2 Crooked Creek, LLC v Cass Co Treasurer*, 329 Mich App 22, 42; 941 NW2d 88 (2019), aff'd 507 Mich 1 (2021) ("[W]hen a trial court, sitting as the finder of fact, is asked to direct a verdict, the motion is actually one for involuntary dismissal.").

[3] Defendant also argued that *Admire* controlled as to the no-fault claim, such that defendant was responsible only for modifications to a van once it is purchased by plaintiff.

[4] The trial court, citing *Admire*, rejected plaintiff's no-fault claim for the purchase price of the van under MCL 500.3107(1)(a), and also rejected plaintiff's argument that a material change in plaintiff's physical condition triggered a separate duty for defendant under a different provision of the 2012 agreement.

is ambiguous does its meaning become a question of fact." *Coates v Bastian Bros, Inc*, 276 Mich App 498, 504; 741 NW2d 539 (2007) (citations omitted).

## III. ANALYSIS

Defendant argues that the 2012 contract does not require it to buy a new van for plaintiff.[5] We agree.

"The general rule of contracts is that competent persons shall have the utmost liberty of contracting and that their agreements voluntarily and fairly made shall be held valid and enforced in courts." *Kendzierski v Macomb Co*, 503 Mich 296; 931 NW2d 604 (2019) (cleaned up). "Absent an ambiguity or internal inconsistency, contractual interpretation begins and ends with the actual words of a written agreement." *Ingham Co v Michigan Co Rd Comm Self-Ins Pool*, 508 Mich 461, 477; 975 NW2d 826 (2021) (cleaned up). "When interpreting a contract, our primary obligation is to give effect to the parties' intention at the time they entered into the contract." *Id.* (cleaned up). To do so, "[w]e interpret contracts by giving plain meaning to the words and phrases used by the parties." *Meemic Ins Co v Jones*, 509 Mich 333, 347; 984 NW2d 57 (2022).

Here, the trial court stated that it found an ambiguity in the contract. "[I]f provisions of a contract irreconcilably conflict, the contractual language is ambiguous, and the ambiguous contractual language presents a question of fact to be decided by a [fact-finder]." *Laurel Woods Apartments v Roumayah*, 274 Mich App 631, 638; 734 NW2d 217 (2007). Put differently, a contract is ambiguous when its provisions are capable of conflicting interpretations. *Klapp*, 468 Mich at 467. "A contract is not ambiguous," however, "if it fairly admits of but one interpretation." *Roumayah*, 274 Mich App at 638. "We will not create ambiguity where the terms of the contract are clear." *Kendzierski*, 503 Mich at 311 (cleaned up).

More specifically, the trial court here stated that it found a *latent* ambiguity as to whether defendant was compelled to buy a new van. "Ambiguity in written contracts can fairly be said to consist of two types: patent and latent. A patent ambiguity is one 'that clearly appears on the face of a document, arising from the language itself.' " *City of Grosse Pointe Park v Mich Municipal Liability & Prop Pool*, 473 Mich 188, 198; 702 NW 2d 106 (2005) (opinion by CAVANAGH, J.) (citation omitted). A latent ambiguity " 'does not readily appear in the language of a document, but instead arises from a collateral matter when the document's terms are applied or executed.' " *Id.* (citation omitted). In one case, for example, a deceased policyholder had named Mary Crosby, his wife, as his beneficiary, but the policyholder's wife's name was actually Harriet Teresa Crosby.

---

[5] Defendant initially argues that there was no contract. However, defendant repeatedly represented to the lower court in briefings and at oral argument that it formed a contract with plaintiff. See, e.g., Defendant's Trial Brief (February 28, 2023) at 2 ("Plaintiff and Defendant have entered into two agreements, one in 2004 and one in 2012, each for a 7 year agreement that required replacement vans when her current van had over 100,000 miles on it."). A litigant " 'may not shift ground on appeal . . . after being unsuccessful on the one presented in the trial court.' " *Webster v Osguthorpe*, ___ Mich ___, ___; ___ NW3d ___ (2025) (Docket Nos. 166627 and 166678); slip op at 7 n 5, citing *Three Lakes Ass'n v Whiting*, 75 Mich App 564, 581; 255 NW2d 686 (1977). Therefore, we deem this argument waived and decline to address it.

See *Hall v Equitable Life Assurance Society of the US*, 295 Mich 404; 295 NW 204 (1940), citing *Crosby v Ball*, 4 Ont L Rep 496, 500 (1902). There was a latent ambiguity in the policy because although the beneficiary designation was clear on its face, the decedent's legal wife had a different name. See *id.* Stated differently, external facts cast confusion on the words used in the contract.

"[R]esort to extrinsic evidence is unnecessary to detect a patent ambiguity." *Id.* But "[e]xtrinsic evidence may be used to show that a latent ambiguity exists." *Shay v Aldrich*, 487 Mich 648, 667; 790 NW2d 629 (2010). Our Supreme Court has further explained that

> [t]o verify the existence of a latent ambiguity, a court must examine the extrinsic evidence presented and determine if in fact that evidence supports an argument that the contract language at issue, under the circumstances of its formation, is susceptible to more than one interpretation. Then, if a latent ambiguity is found to exist, a court must examine the extrinsic evidence again to ascertain the meaning of the contract language at issue. [*Id.* at 668 (cleaned up).]

In this case, the dispute centers on whether the 2012 contract obligates defendant to buy a subsequent vehicle for plaintiff, beyond the initial vehicle that was purchased under that agreement in or around 2012. To begin with, the trial court's framing of the purported ambiguity as "latent" was error. The trial court found that "it is impossible, based on the terms of the contract, to discern what the parties agreed to or the rights and responsibilities of the parties when Plaintiff brought a claim for a new van after seven years." However, the trial court did not point to "a collateral matter," or outside facts, that would render the agreement ambiguous. See *Grosse Pointe Park*, 473 Mich at 198. Rather than concerning "a matter outside of the text" of the contract, the interpretive dispute implicates patent ambiguity, that is, ambiguity that "aris[es] from the language" of the agreement itself—in this case, whether the contract addressed what the parties agreed to do should plaintiff bring a claim for a new van after seven years had elapsed. *Id.* Therefore, there is no latent ambiguity in the contract, and the appropriate inquiry is whether the agreement is patently ambiguous, or ambiguous on its face. This task involves analyzing only the provisions of the contract, as "resort to extrinsic evidence is unnecessary to detect a patent ambiguity." *Id.*

Turning to the language of the contract, we conclude that there is no ambiguity. The agreement is titled "Settlement Agreement and Partial Release of No-Fault Personal Protection Insurance Benefits: Purchase of a Handicapped-Equipped Van." Thus, the title supports that the scope of the agreement was to settle a no-fault claim through the insurer's purchase of a single modified van. The prefatory section of the agreement explains that the insured, plaintiff, suffered injuries from an automobile accident in 1973, that she filed a claim, and that the insurer has provided benefits for her injuries. The first section, titled "Purchase of Van & Handicap Equipment," initially explains in the first paragraph that the parties agree that the insurer shall purchase a van for plaintiff. As defendant argues, the first and second paragraphs support that the agreement's purview is limited to the purchase of one van, given that the language refers to only one purchase of a specific van: "It is agreed between the insured and the insurer that the insurer shall pay $64,806.82 for the purchase of *a* handicapped-equipped 2012 ODYSSEY EX-L van, VIN # . . . " (emphasis added); insurer "shall be entitled to any proceeds from the manufacture rebates for *the* purchase of *the* van" (emphasis added). In addition, other headings in the document

also refer to a single van—e.g., "Ownership of Van," "Insurance of Van," "Maintenance of Van"—again suggesting that the agreement contemplates the purchase of only one van.

The trial court found ambiguity chiefly because of paragraph three of the agreement, which states: "It is further agreed between the insured and the insurer that no claims for another van/motor vehicle may be made for seven (7) years from the date of the delivery of the van/motor vehicle to the insured, except as specified in paragraph 14."[6] The trial court accurately read paragraph three as indicating that the parties agreed that a new claim for another van could not be made for seven years unless there was a material change in plaintiff's physical condition. The clause details temporal restrictions on *plaintiff's* ability to bring a new claim—no such claim may be made within seven years (with the exception specified in a separate paragraph). But it says nothing about what would happen if a claim were brought after seven years elapsed—i.e., whether *defendant* was obligated to respond to such a claim in a particular way. The trial court held that the agreement was ambiguous because it contemplated the possibility that plaintiff could bring a claim for another van after seven years and it was impossible to discern what the parties agreed would happen if such a claim were brought.

Other paragraphs also refer to the hypothetical possibility of another van purchase. Paragraph 16 details what will happen with the old van "*if* a new van is purchased by [defendant] at the end of the agreed term."[7] (Emphasis added.) In addition, paragraph 17 contemplates that plaintiff may be the one purchasing a vehicle in the future, by referencing "any van subsequently purchased by the insured."[8] Further, paragraph 18 contains a disclaimer of liability. That is, the parties agreed that defendant "does not acknowledge liability" to plaintiff.[9] Finally, as for the duration of the agreement, a section titled "Termination of Agreement" explains that it shall terminate upon the death of plaintiff or the written agreement of the parties.

---

[6] Paragraph 14, in turn, provides that: "It is further agreed that if there is a material change in the physical condition of [plaintiff] as it relates to [her] transportation needs that would preclude the use of this handicapped-equipped van, then the insurer shall provide such equipment and/or mode of transportation as is reasonably necessary, and is compatible with a change in the physical condition or transportation needs of [plaintiff]."

[7] Paragraph 16 states: "It is further agreed that if a new van is purchased by the insurer at the end of the agreed term, the van subject to this Settlement Agreement shall be sold and the proceeds used toward the purchase of a new van. If the insured refuses to sell the subject van, then the insurer shall use the fair market value of the van as a credit toward the purchase price of a new van."

[8] Paragraph 17 states: "It is further agreed between the insured and the insurer that upon the sale of the van, any salvageable handicap equipment shall be removed from the van at the expense of [defendant], and may be reinstalled in any van subsequently purchased by the insured."

[9] Paragraph 18 provides: "It is further agreed between the insured and the insurer that by entering into this Agreement, [defendant] does not acknowledge liability to the undersigned and that the provisions and agreement contained herein are contractual and not a mere recital."

Viewing the provisions of the agreement as a whole, the parties contemplated that defendant, or even plaintiff, might buy another van. But nothing in the agreement could be read as obligating defendant to do so. Moreover, defendant disclaimed any liability to plaintiff. The provisions do not "irreconcilably conflict" nor are they "capable of conflicting interpretations." See *Roumayah*, 274 Mich App at 638. An agreement is not rendered ambiguous merely because it does not address a hypothetical future situation. As a general matter, parties need not include or omit any terms from their contracts. See *Kendzierski*, 503 Mich at 312 (parties "shall have the utmost liberty of contracting"). Rather than being ambiguous, the contract is simply silent regarding whether defendant must approve a future claim from plaintiff for another van, except in the case of a material change in plaintiff's physical condition that precludes the use of the van addressed in the agreement, in which case the insurer must provide reasonably necessary equipment or transportation. The contract therefore "fairly admits of but one interpretation." *Roumayah*, 274 Mich App at 638. Because the contract terms are clear, we must enforce them as written. *Kendierski*, 503 Mich at 312. The agreement does not require defendant to buy another modified van for plaintiff.

The trial court relied on a factually similar unpublished case, *Teachworth v Citizens Ins Co of Am*, unpublished per curiam opinion of the Court of Appeals, issued May 17, 2016 (Docket No. 327699),[10] in finding that the contract was ambiguous. There, this Court determined that the modified van agreement in question was ambiguous on its face, reversing the trial court's grant of summary disposition in favor of the plaintiff and remanding for the trial court to determine the meaning of the ambiguous contract, a question of fact. *Id.* at 8. However, the language of the *Teachworth* agreement was markedly different from that here. Its paragraph three stated:

> It is further agreed that subsequent to purchase of additional vehicles in accordance with the provisions of this agreement, [the defendant] will not be obligated to consider the purchase and/or modification of any additional vehicles for a period of 6 years, and no claim shall be made for the purchase or lease of substitute transportation for the undersigned before one or the other stipulation is met. [*Id.* at 5.]

While this clause, similarly to this case, contemplated the possibility of a new claim by the plaintiff for additional vehicles, it is distinguishable because it explicitly referred to "the purchase of additional vehicles in accordance with the provisions of this agreement." *Id.* No similar language appears here. Instead, here, paragraph three simply operates as a restriction on plaintiff's ability to file a new claim. Further, the *Teachworth* agreement lacked several terms—as to the conditions under which additional vehicles would be purchased, and as to what "one or the other stipulation" means. *Id.* And "most significantly," other provisions of the agreement "directly

---

[10] Although unpublished decisions are not binding under the rule of stare decisis, MCR 7.215(C)(1), we may consider them for "their instructive or persuasive value." *Cox v Hartman*, 322 Mich App 292, 307; 911 NW2d 219 (2017).

contradict[ed]" paragraph three because, for example, the agreement contained releases of liability for the defendant. *Id.*

In sum, the trial court erred by finding an ambiguity in the contract, whether framed as latent or patent. The agreement by its plain terms is silent as to defendant's obligation to buy another van, which means that it has no obligation under the agreement to do so. Because we hold that defendant is not liable to plaintiff on the contract, we need not address defendant's argument that the trial court erred by awarding plaintiff damages.[11]

Reversed and remanded for entry of judgment in favor of defendant. We do not retain jurisdiction.

/s/ Adrienne N. Young
/s/ Anica Letica
/s/ Daniel S. Korobkin

---

[11] Nor do we address plaintiff's argument on appeal that the trial court erred by rejecting her claim for relief under the no-fault act. This request seeks to enlarge the scope of relief obtained below, but an appeal is limited to the claims on which the appellant seeks review, unless the appellee files a cross-appeal. *Rohl v Leone*, 258 Mich App 72, 77 n 2; 669 NW2d 579 (2003). Because plaintiff did not file a cross-appeal on her no-fault claim, it is not properly before this Court.